

**FILED**

Sep 02 2015, 8:45 am

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEY FOR APPELLEE |
|---|---|
| Jennifer A. Joas | Leanna Weissmann |
| Madison, Indiana | Lawrenceburg, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re the Adoption of E.A., M.A., | September 2, 2015 |
| *Appellant-Respondent*, | Court of Appeals Case No. 78A01-1504-AD-153 |
| v. | Appeal from the Switzerland Circuit Court |
| D.B., | The Honorable W. Gregory Coy, Judge |
| *Appellee-Petitioner*. | Trial Court Cause No. 78C01-1310-AD-4 |

**Brown, Judge.**

[1] M.A. ("Appellant"), the biological father of E.A., appeals the trial court's decree granting the petition for adoption of E.A. by D.B. ("Adoptive Father"). Appellant raises one issue which we revise and restate as whether the court erred in granting Adoptive Father's petition for adoption over the objection of Appellant. We affirm.

## Facts and Procedural History

[2] On February 5, 2009, E.A. was born to R.B., the mother ("Mother"), and Appellant. Appellant had been arrested for burglary previous to the birth, but he bonded out and was present at E.A.'s birth and signed a paternity affidavit pursuant to Ind. Code § 16-37-2-2.1. Following the birth, Appellant, Mother, and E.A. lived with Appellant's mother. On March 16, 2009, when E.A. was six weeks old, Appellant was re-arrested on burglary charges. Appellant has two other children who met E.A. once, when E.A. was three months old.

[3] During the pendency of Appellant's burglary case, he was held at the Jefferson County Jail. While there, Mother kept in contact with him, and the two had an understanding that they would remain in a relationship. On July 21, 2010, Appellant was sentenced to fifteen years on the burglary conviction and transferred to the Department of Correction (the "DOC"), and contact between then one-year-old E.A. and Appellant waned. Appellant "may have sent a birthday card the first birthday that [E.A.] had after [Appellant] went to prison," but no further contact was had. Transcript at 21. Mother stopped sending Appellant pictures of E.A. after E.A.'s second birthday. The last time

Appellant saw E.A. was immediately after he was sentenced on July 21, 2010 when the court arranged for a visit.

[4] Mother started dating Adoptive Father in the fall of 2010. On April 13, 2011, Mother married Adoptive Father.

[5] On October 17, 2013, Adoptive Father filed a petition for adoption of E.A. alleging that Appellant: (A) has abandoned E.A.; (B) has failed to contact or support E.A. for at least one year; and (C) has not established paternity or has failed to register with the putative father registry. On November 14, 2013, Appellant filed a Verified Motion to Contest Adoption, as well as a Petition to Establish Paternity and Provide Support.

[6] On March 31, 2015, the court held a hearing on Adoptive Father's petition. Adoptive Father testified that he has lived with E.A., who at that point was six years old, since 2010, that they have a father-son relationship and E.A. calls him "Dad," and that he is the only father E.A. has ever known. *Id.* at 9. He stated that during his time living with E.A., there had not been any contact between Appellant and E.A. When asked whether Appellant had been hindered in contacting E.A., Adoptive Father testified that they kept the address Appellant had until almost 2012, and that no mail had been sent to E.A. by Appellant at that address: He further noted that "when we got the papers from the Court after we filed this, that [E.A.] was about to have a birthday, Christmas and he knew the address because he sent us the paperwork. He still didn't send [E.A.] a birthday card or Christmas card or letter." *Id.* at

10. He also testified that when the couple moved from the address Appellant had on file, they had their mail to that address forwarded to their new residence. He stated that he and Mother have another child and that E.A. helps to take care of her and "loves her to death . . . ." *Id.* at 13.

[7] Mother testified that Appellant wrote her "a couple of letters" after sending the birthday card for E.A.'s second birthday, but she lost contact with him during that year. *Id.* at 21. She indicated that at the time the petition for adoption was filed Appellant had not filed anything to establish paternity, and she never received any monetary support from him, nor from any of Appellant's family on his behalf. She testified that she had had contact with Appellant's sister five or six times but "not in the past two years . . . ." *Id.* at 24. Mother testified that, after Appellant was arrested, on multiple occasions she attempted to make arrangements to visit with Appellant's mother with E.A., but Appellant's mother "always had a reason not to." *Id.* at 32.

[8] On cross-examination, Mother indicated that she changed her cell phone number "numerous times," the first time being "shortly after" Appellant was incarcerated, and she did not provide Appellant with her new phone number. *Id.* at 26. She acknowledged that she "did nothing really to encourage [Appellant] to continue contacting" her. *Id.* at 27. She testified that Appellant's sister attempted to make contact with her at her place of employment at a restaurant, but she avoided the sister by going into the kitchen. She indicated that it was "fair to say" she avoided telephone calls from Appellant's family. *Id.* at 30. She also testified that Appellant's sister had her current phone number,

which she has not changed since 2012, but that she has not received calls from the sister.

[9] Appellant testified that he had a substantial criminal history and that he had previous prison sentences for crimes of burglary and forgery. He testified that he was currently serving his burglary sentence through parole and probation, that he had been out of prison for two months, and that he was living with his sister. He stated that prior to his burglary conviction he had been out of prison for eighteen months, that prior to that he had been out for nine months, and that of the past twelve years he has been out of prison for about two years. He testified that he earned twelve dollars per month in prison and that he did not send any of his earnings to support E.A. or his other children. He also testified that fifteen percent of his earnings went into an inmate trust fund, that his other earnings went to pay for items like soap and shampoo, and that when he was released from prison he had $250 in his account. He further testified that at the time of the hearing he was painting six days a week in Madison, Indiana.

[10] Appellant further testified that he stopped writing letters because he "had no idea if [Mother] was getting the letters," but he further acknowledged that he did not receive any of his letters returned as undeliverable. *Id.* at 45. He stated that he did not have an accurate telephone number to reach Mother, and that at one point his sister gave him a new telephone number for Mother but that "by the time [he] put it on [his] phone list, it took a couple of weeks to get it activated, and it was gone. It didn't work any more [sic]." *Id.* at 46. He testified that he became aware of the current address of E.A. and Mother when

he "received this hearing paper." *Id.* He also explained that he "was also concerned with [Mother] calling in and saying 'hey, this guy won't leave me alone'. . . . so I just figured it was best to stop." *Id.*

[11] Appellant was asked by the court whether he had been married to the mother of his other children, and he replied that he had not been married to her but had filed a paternity case in Madison. The court asked if he ever asked his "family to hire a lawyer so that [he] could try to make some inroads with" E.A., and he responded that his family "doesn't have the means for an attorney." *Id.* at 56.

[12] On April 7, 2015, the court issued its order on petition for adoption granting Adoptive Father's petition and denying Appellant's verified motion to contest adoption and petition to establish paternity. The court entered findings consistent with the foregoing and stated the following, under the heading "Law and Discussion":

> [Appellant] has an extensive criminal history, and has never provided housing for [E.A.] for any time; he is only recently released from incarceration, and while this Court believes him when he says he is on the right track, he is only able to work with his father at this time and will be unlikely to find meaningful employment in the near future due to his lengthy criminal record. Due to his incarceration and [Mother's] decision not to take [E.A.] to meet with him in prison, [Appellant] has not communicated with [E.A.] for the majority of his life. Individuals who are incarcerated due to criminal activity risk being denied the chance to develop meaningful relationships with their children. *Castro v. State Office of Family and Children*, 842 N.E.2d 367, 374 [(Ind. Ct. App. 2006), *trans. denied*]. There is no guarantee that [Appellant] will be able, now or in the future, to

support [E.A.] or be a fit parent. The Court finds that it would be inappropriate to require a six year old child to wait and see how his recently-released biological father will fare in life before deciding whether to grant and [sic] adoption petition. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 883 [(Ind. Ct. App.] 2004).

As to the issue of lack of communication, the burden is on [Adoptive Father] to prove that there has been a lack of contact for the statutory period, and that the ability to communicate during that period existed. *In Re Adoption of Anonymous* (1973), 158 Ind.[ ]App.238, 302 [N.E.2d] 507. Here, [Appellant] did not have significant communication with [E.A.] from the time [E.A.] was six weeks old. He did not file any legal proceedings to establish paternity, parenting time, support or the like. His family likewise failed to take any action on his behalf; and he nor his family ever provided anything in the way of financial support to [Mother] for [E.A.]; this court finds this to be equivalent to abandonment or desertion. While [Mother] did not keep [Appellant] or his family apprised of her address or phone number, this Court finds that she did not knowingly conceal her whereabouts, change her or [E.A.'s] name, or engage in some other form of subterfuge to avoid all contact with [Appellant]. Therefore, the Court finds that [Adoptive Father] has proven by clear and convincing evidence that [Appellant] failed to have meaningful communication with [E.A.] without justifiable cause. Finally, the evidence clearly and convincingly establishes that [Appellant] was at the time of the filing of the petition and at the time of the hearing unfit to be a parent and it is in the best interests of [E.A.] for the Court to dispense with [Appellant's] consent in this case and grant [Adoptive Father's] Petition to Adopt.

Appellant's Appendix at 32-33 (footnote omitted).

*Discussion*

[13] The issue is whether the court erred in granting Adoptive Father's petition for adoption over the objection of Appellant. When reviewing the trial court's ruling in an adoption proceeding, we will not disturb that ruling unless the evidence leads to but one conclusion and the trial judge reached an opposite conclusion. *In re Adoption of T.L.*, 4 N.E.3d 658, 662 (Ind. 2014). We presume the trial court's decision is correct, and we consider the evidence in the light most favorable to the decision. *Id.*

[14] When the trial court has made findings of fact and conclusions of law, we apply a two-tiered standard of review: we must first determine whether the evidence supports the findings and second, whether the findings support the judgment. *Id.*; see Ind. Trial Rule 52(A) (providing that where the trial court has made findings of fact and conclusions of law, "the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses"). Factual findings are clearly erroneous if the record lacks any evidence or reasonable inferences to support them and a judgment is clearly erroneous when it is unsupported by the findings of fact and the conclusions relying on those findings. *In re Adoption of T.L.*, 4 N.E.3d at 662.

[15] Ind. Code § 31-19-9-1(a) provides in part that, "[e]xcept as otherwise provided in this chapter, a petition to adopt . . . may be granted only if written consent to adoption has been executed" by "(2) The mother of a child born out of wedlock and the father of a child whose paternity has been established by . . . (B) a

paternity affidavit executed under IC 16-37-2-2.1 . . . ."  However, Ind. Code §
31-19-9-8 provides that:

> (a) Consent to adoption, which may be required under section 1 of this chapter, is not required from any of the following:

>> (1) A parent or parents if the child is adjudged to have been abandoned or deserted for at least six (6) months immediately preceding the date of the filing of the petition for adoption.

>> (2) A parent of a child in the custody of another person if for a period of at least one (1) year the parent:

>>> (A) fails without justifiable cause to communicate significantly with the child when able to do so; or

>>> (B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.

>> * * * * *

> (11) A parent if:

>> (A) a petitioner for adoption proves by clear and convincing evidence that the parent is unfit to be a parent; and

>> (B) the best interests of the child sought to be adopted would be served if the court dispensed with the parent's consent.

* * * * *

(b) If a parent has made only token efforts to support or to communicate with the child, the court may declare the child abandoned by the parent.

[16] Here, the trial court found that all of the foregoing statutory provisions applied to Appellant, and he challenges the court's findings with respect to each provision. "However, the statute is written in the disjunctive such that the existence of any one of the circumstances provides sufficient ground to dispense with consent." *In re Adoption of O.R.*, 16 N.E.3d 965, 973 (Ind. 2014). Because we conclude the trial court properly relied on at least one statutory provision— namely, that for a period of at least one year Appellant failed without justifiable cause to communicate significantly with E.A. although he was able to do so, *see* Ind. Code § 31-19-9-8(a)(2)(A)—we do not address other provisions on which the trial court may also have relied.

[17] Appellant argues that he was present at E.A.'s birth and welcomed responsibility for the child by signing the paternity affidavit, distinguishing *Matter of Adoption of Herman*, 406 N.E.2d 277, 279 (Ind. Ct. App. 1980), *reh'g denied*. He notes that he exchanged multiple letters with Mother while at the Jefferson County Jail and had a visit with E.A. immediately after his sentencing in July 2010. He argues that he sent letters to Mother while at the DOC in which he would write about E.A., as well as a birthday card to E.A. for his second birthday, but in each instance he received no response. He asserts that he tried to call Mother but she changed her phone number and did not provide

him with her new number. He also argues that he asked his family to try and contact Mother, and Mother admitted at the hearing that she avoided Appellant's sister when she attempted to contact Mother by phone or at Mother's place of employment. He further asserts that he was afraid to continue with his attempts to contact Mother for fear of repercussions at the DOC.

[18] Adoptive Father argues that Appellant admits he had very little communication with E.A. after he was sent to the DOC. He contends that Appellant did not support his argument regarding the possible repercussions for contacting Mother, noting that she "did not accuse him of stalking," "did not threaten him with punitive action if he wrote" E.A., and "did not tell him to stop," and Appellant "could have persisted in exercising his legal rights." Appellee's Brief at 7. Adoptive Father asserts that Appellant's arguments regarding Mother's address are contravened by the record, which demonstrates that she kept the mailing address known to Appellant until 2012 and then had her mail forwarded to her new address. He further notes that there is no evidence of mail being returned to father as undeliverable. Adoptive Father argues that Appellant's family knew where Mother worked, but Appellant never contacted her there. Adoptive Father maintains that Appellant's "lack of correspondence with E.A. was a matter of choice not necessity," and "[s]etting aside [his] excuses, he had no legitimate reason to ignore E.A. for more than a year." *Id.* at 9.

[19] In *Lewis v. Roberts*, 495 N.E.2d 810 (Ind. Ct. App. 1986), this court addressed the level of communication necessary to qualify as significant for the purposes of Ind. Code § 31-19-9-8(2)(A) where the objecting parent is incarcerated.[1] Donald Lewis had been sentenced to eight years imprisonment on a conviction of burglary in April of 1980, two years and eight months after daughter Erin was born, in which Lewis, Erin, and Erin's mother Doris Roberts saw each other regularly and occasionally lived together. 495 N.E.2d at 811. During the first nine months of Lewis's incarceration, he wrote Erin weekly and saw her every other week when Doris brought her to the prison. *Id.* By about the end of 1980, however, Doris stopped visiting Lewis and stopped answering his letters. *Id.* In the ensuing years, Lewis continued to write letters, writing letters two or three times a year and sending a total of ten letters in 1982 and 1983. *Id.* There was also evidence in the record that Lewis wrote four letters in 1984 prior to his release in November of that year. *Id.* at 811-812. Also, during his incarceration he sent Erin cards and gifts on her birthday, Christmas, and occasionally at Easter, and these gifts continued through 1984 when Doris

---

[1] The relevant statute in *Lewis* was a predecessor statute, Ind. Code § 31-3-1-6(g), which provided:

> Consent to adoption is not required of:

> (1) a parent or parents if the child is adjudged to have been abandoned or deserted for six (6) months or more immediately preceding the date of the filing of the petition; or a parent of a child in the custody of another person, if for a period of at least one (1) year he fails without justifiable cause to communicate significantly with the child when able to do so or knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree (when the parent or parents have made only token efforts to support or to communicate with the child, the court may declare the child abandoned by the parent or parents).

(Repealed by Pub. L. No. 1-1997, § 157).

began to refuse presents from Lewis and his family. *Id.* at 811. Lewis also "made continuing, unsuccessful attempts to see his daughter." *Id.*

[20] This court observed that Petitioner Joseph Roberts was "required to prove not only that Lewis failed to communicate, but also that he was able to do so," noting that "[e]fforts of a custodial parent to hamper or thwart communication between parent and child are relevant in determining the ability to communicate." *Id.* at 812-813. Regarding Lewis's status as an inmate, the court noted the following:

> Lewis' communication with his daughter must be viewed in the context of his incarceration. Imprisonment standing alone does not establish statutory abandonment. *Matter of Adoption of Herman* (1980), Ind. App., 406 N.E.2d 277. Neither should confinement alone constitute justifiable reason for failing to maintain significant communication with one's child. *Id.* Incarceration, however, unquestionably alters the means for significant communication. *Id.* (Garrard, P.J., concurring). What constitutes insignificant communication with a free parent may be significant in relation to an incarcerated parent with limited access to his child.

*Id.* at 813. The court reversed the trial court's grant of Joseph's petition for adoption, concluding that Lewis's "persistence in writing his daughter, sending her cards and gifts and asking Ms. Roberts to bring Erin for visits" displayed "a continuing interest in" her, and that accordingly Joseph failed to meet his burden of proof. *Id.* In so holding, the court specifically noted that Lewis "persisted for four years despite Ms. Roberts' failure to answer his letters and "expressed a desire to see Erin which Ms. Roberts refused to honor." *Id.*

Here, although we empathize with the situation Appellant faced, we cannot say that he displayed the requisite level of persistence demonstrating a continued interest in E.A., and the evidence shows he chose to end his efforts to do so. The record reveals that following his commitment to the DOC, he sent Mother a few letters in which E.A. was mentioned and sent E.A. a birthday card on his second birthday. Appellant did not receive any of the letters he sent returned as undeliverable, and indeed Mother testified that she kept the address Appellant had been sending mail to until 2012 and then had her mail forwarded to her new address. Appellant did not send a communication for a period of over two years prior to Adoptive Father's filing of his petition for adoption. To the extent Appellant suggests that he stopped writing letters due to fears of repercussions at the DOC, we note that there was no evidence presented that Mother asked him to stop writing or otherwise threatened him with punitive action if he continued to write her. Also, although we find that contact between Appellant's sister and Mother to be of marginal relevance, we note that Mother indicated that his sister had not phoned her since 2012, and Mother has had the same phone number since that time.

Based upon the record before us there was clear and convincing evidence before the trial court that while E.A. was "in the custody of another person [and] for a period of at least one (1) year [Appellant] . . . fail[ed] without justifiable cause to communicate significantly with [E.A.] when able to do so." Ind. Code § 31-19-9-8(a)(2)(A). Appellant's consent to the adoption of E.A. was therefore not

required.[2] *See In re Adoption of O.R.*, 16 N.E.3d at 973-975 (holding that the natural father, who was incarcerated, failed without justifiable cause to communicate significantly with his daughter, and noting that he called his daughter once, and that he did not attempt mail communication with her despite his awareness that the adoptive parents were represented by counsel and therefore he "could have initiated contact through their counsel or the court to communicate with" her).

## *Conclusion*

[23] For the foregoing reasons, we conclude that Appellant's consent to the adoption of E.A. by Adoptive Father was not required pursuant to Ind. Code § 31-19-9-8. We affirm the decree of adoption entered by the trial court.

[24] Affirmed.

Riley, J., and Friedlander, Sr. J., concur.

---

[2] We note that "[e]ven if a court determines that a natural parent's consent is not required for an adoption, the court must still determine whether adoption is in the child's best interests." *In re Adoption of O.R.*, 16 N.E.3d at 974 (citing Ind. Code. § 31-19-11-1(a)(1)). Here, the court stated in its order that it was in E.A.'s best interests to grant Adoptive Father's petition, and Appellant does not challenge the court's determination.