# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 23 2016, 9:28 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEY FOR APPELLEE |
|---|---|
| Kimberly S. Lytle | Tia R. Brewer |
| Indianapolis, Indiana | Marion, Indiana |

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Adoption of S.M.M., T.M.S., | November 23, 2016 |
| *Appellant-Respondent Natural Mother*, | Court of Appeals Case No. 27A02-1602-AD-366 |
| v. | Appeal from the Grant Superior Court |
| K.L.M., | The Honorable Warren Haas, Judge |
| *Appellee-Petitioner*. | Trial Court Cause Nos. 27D03-1403-AD-6 27D03-0401-JP-43 |

**Brown, Judge.**

[1] T.M.S. ("Appellant"), the biological mother of S.M.M., appeals the trial court's decree granting the petition for adoption of S.M.M. by K.L.M. ("Adoptive Mother"). Appellant raises one issue which we revise and restate as whether the court erred in granting Adoptive Mother's petition for adoption over the objection of Appellant. We affirm.

## Facts and Procedural History

[2] On November 22, 2003, S.M.M. was born, and on January 14, 2004, S.L.M. ("Father") was administratively adjudicated to be S.M.M.'s biological father by paternity affidavit. A paternity action (the "Paternity Action") was initiated on January 15, 2004, when Appellant filed her Verified Petition to Establish Child Support. In the ensuing years, the relationship between Appellant and Father as co-parents of S.M.M. has resulted in protracted litigation. On February 3, 2005, Appellant and Father entered into an Agreed Order on Custody and Support giving them joint legal and physical custody of S.M.M., with Father having parenting time at specified times. On July 5, 2006, the court issued a temporary order restricting Mother's parenting time to no overnights, but she was again granted joint custody with overnight visits on July 28, 2006.

[3] On November 17, 2006, Jill Crouch Vugteveen, the Guardian Ad Litem (the "GAL"), filed her report (the "GAL Report") stating that the home of Father and Adoptive Mother was large, organized, and very clean, and that there was structure in place for S.M.M., who "appeared to have a close relationship with both of them." Appellant's Appendix Vol. 2 at 193. As for Appellant's home the GAL Report noted that Appellant, S.M.M., and S.M.M.'s half-sister S.G.

often slept in Appellant's bed, and that S.M.M. appeared to behave differently at Appellant's home in that she was not obedient and was disruptive. At Appellant's home, the GAL observed S.M.M. "crawl on top of the sink" in the bathroom and "position[] herself into 'doggie style' and proceed[] to simulate a sex act," in which "[i]t was very clear that she was simulating something she had seen, whether on TV or in person, and she laughed a bit mischievously . . . ." *Id.* at 194-195. The GAL noted that S.M.M. attempted "to 'open mouth' kiss her sister, and attempted to lift [the GAL's] shirt up on a few occasions." *Id.* at 195. The GAL opined that Appellant's home was not structured, in that S.M.M. would eat and sleep at random times, and that Appellant did not provide adequate supervision. The GAL also noted that, due to inadequate supervision, S.M.M. received a dog bite on her leg while climbing a ladder to a swimming pool. The Report further states that S.M.M. had been at the home of Father and Adoptive Mother "more than the allotted time," that Appellant "seems to make excuses as to why that has occurred," that it appeared this was the result of Appellant not leading an organized and structured life, and that she was "irresponsible." *Id.* at 198. It further noted a significant school attendance problem regarding S.G.

[4] The GAL Report indicates that the GAL reviewed video taken by Appellant's neighbor showing that Appellant had several people in and out of her home, despite Appellant's claims to the contrary, and discussed a specific recording taken the evening of October 9, 2006, which depicted several people at Appellant's home and that

both [S.M.M.] and [S.G.] were there, along with what sounded to be a younger group of people, both males and females. The group was constantly cussing in front of [Appellant's] daughters; one person continued a conversation about how she was so drunk the night before that she "had no idea how she got home". [Appellant] then yells, "Take him home, he's getting on my nerves…I have two kids!", and [S.G.] responds by yelling, "Shut up, idiot, shut the hell up! Asshole! Love ya, though". While this interaction is occurring, [S.M.M.] is screaming and crying in the background…she cried for nearly twenty-five minutes. While [S.M.M.] appeared to be crying out for attention, someone would randomly make comments to her stating "it's okay". Things did not seem to be "okay"…they seemed to be utter chaos, and completely permitted to be so.

*Id.* at 199-200.

[5] The GAL Report further noted that Appellant did not exercise good judgment when she let S.G. stay with a neighbor who has a registered sex offender son living in a home where drugs may be sold. The Report also described a video taken on October 17, 2006, depicting five males who appeared "younger" visit Appellant's trailer, stay for approximately twenty minutes and leave, and noting that although Appellant denied selling drugs she has been accused of selling prescription medication and that the video "did not 'seem right'" and, in any event, proved "once again that she does have people 'in and out' of her home." *Id.* at 201. It also noted that about ten or fifteen minutes after the car left in the video, Appellant "gets into another argument with a neighbor, and she yells, 'You scare me with your big ass peanut head…what are you going to do, call [Father]?'" and that "[t]his comment sounds to [the GAL] as if the

neighbor may have observed some sort of action that would have caused [Father] to be concerned." *Id.* The report further noted the GAL's belief that Appellant lacked the objectivity to make calm decisions relating to S.M.M. under pressure and that she struggles financially to provide for her family's needs, noting specifically there was an issue regarding paying her gas bill.

[6] The GAL Report recommended that S.M.M. be placed in the custody of Father and that Appellant receive visitation rights. The same day the GAL report was filed, Father filed an emergency petition to modify parenting time based thereon, and the court entered an ex parte order modifying Appellant's parenting time to no overnight visitation. On December 28, 2006, the GAL filed an addendum to the GAL Report in which she stated that her "preference would have been to recommend that [Appellant] and [Father] have equal rights" but that "after spending many many hours on the case, [she] could not in good conscience make that recommendation." *Id.* at 215.

[7] On August 22, 2007, the court entered an Agreed Order on Custody, Parenting Time and Child Support granting Father custody of S.M.M. and Appellant parenting time periods of four hours twice a week. It also ordered Appellant to pay child support pursuant to the Indiana Child Support Guidelines. In September 2007, Appellant filed a petition alleging that Father refused her parenting time and Father filed a petition to restrict visitation soon after. In May 2008 the parties agreed to continue hearing these issues pending a report by the Family Service Society, and in May 2009 Father filed another petition to terminate or restrict Appellant's visitation rights. In May 2010, the court held a

hearing on these motions and entered an order stating that Appellant was entitled to unrestricted, unsupervised parenting time in accordance with the Guidelines, that Father had "willingly, knowingly, and repeatedly violated existing orders regarding parenting time," found Father in indirect contempt of court, and ordered him to serve thirty days in the Grant County Jail, which order was suspended on the condition that Father refrain from further violations of the parenting time orders. Appellant's Appendix Vol. 3 at 135. On July 15, 2010, the court entered an order awarding Father sole care, custody, and control of S.M.M. and ordering Appellant to pay eleven dollars per week in child support.

[8] On September 4, 2012, Appellant filed a Motion for Rule to Show Cause alleging parenting time violations by Father, and on September 11, 2012, Father filed another Petition to Restrict Parenting Time alleging that S.M.M. was in emotional and physical danger when in the care of Appellant and that S.M.M. was engaging in or being exposed to criminal activity. On September 20, 2012, Father filed a motion for change from judge which the court granted on September 21, 2012. On December 10, 2012, Judge Warren Haas accepted appointment as special judge.

[9] On January 11, 2013, Appellant filed her Verified Petition to Modify Custody, Support and Visitation, and a hearing was held on February 8, 2013 on the pending motions. Dr. Henry Martin, a clinical psychologist specializing in child and adolescent therapy who treated S.M.M. since August 2011, testified that he diagnosed S.M.M. with "anxiety type symptoms," which were caused

by her visitations with Appellant. Transcript at 331. Dr. Martin identified noise at night, being left alone at night with T., her half-brother who was one or two years old at the time of the hearing, and that there was smoking in the home as reasons for S.M.M.'s anxiety.

[10] Dr. Martin also testified that, in the months leading up to the hearing, S.M.M. had disclosed "even more troubling issues" regarding Appellant's home. *Id.* at 334. He stated that S.M.M. was caught stealing candy from a convenience store after observing S.G. shoplifting, that Appellant "was involved in that process and there wasn't any correction for [S.G.] for doing that," and that Appellant was not concerned with this behavior. *Id.* at 335. Second, he testified about an incident in which Appellant called S.M.M., told her to pack her bags and not to tell Father or Adoptive Mother, and caused S.M.M. anxiety and fear because she did not want to go. Ultimately, the police had to pick up S.M.M. Third, Dr. Martin testified that S.M.M. took a ring from her aunt and, although she "knew that that was wrong after the fact," she "somehow [] had it in mind that it was okay to take." *Id.* at 335. Fourth, Dr. Martin testified regarding S.M.M. watching pornography "through the summer" at Appellant's home and discussing sexually explicit subjects with her friend E.B. *Id.* at 336.

[11] Dr. Martin testified that S.M.M. had been internalizing the issues she had disclosed to him and that such repeated trauma can cause Post Traumatic Stress Syndrome, or PTSD. Based on the things S.M.M. had told him during therapy, he stated his concern with S.M.M.'s safety and well-being were Appellant to continue to exercise parenting time. Dr. Martin stated that, since September

when S.M.M. stopped going to Appellant's residence, her anxiety lessened and she was not "acting out" as much. *Id.* at 342.

[12] On February 15, 2013, the court issued its Order Modifying Parenting Time Order stating that Appellant would no longer have customary parenting time privileges with S.M.M. and that her parenting time would be restricted to: (A) supervised visits once a week at Cornerstone; (B) visits at school during lunch; (C) phone calls to Father's cell phone; and (D) participation in school activities. The court found that "the current parenting time order has significantly endangered [S.M.M.'s] emotional development," citing Ind. Code § 31-17-4-1(a).

[13] On March 14, 2014, Appellant was served with the Notice of Adoption filed by Adoptive Mother (the "Adoption Action"). On April 7, 2014, Appellant filed her Refusal to Consent to Adoption. On November 5, 2014, Appellant filed another Motion for Rule to Show Cause in the Paternity Action alleging that Father violated the court's order related to parenting time. In December 2014, Judge Haas was appointed as special judge in the Adoption Action, and the Paternity Action and the Adoption Action proceeded simultaneously. A hearing regarding the adoption petition and Appellant's motion was held on June 19, 2015, and September 23, 2015.

[14] On January 20, 2016, the Court entered its Judgment Dispensing with Mother's Consent to Adoption Petition and Entry of Related Orders (the "Judgment"). The Judgment stated in part:

3. In an effort for the Court to receive an outside unbiased opinion, a Guardian Ad Litem was appointed to this matter . . . .

* * * * *

Both [Appellant] and Father have behaved badly, making things worse instead of better. [S.M.M.] is the unfortunate victim of their disagreements.

It is an oversimplification, but accurate to say:

A. [Appellant's] past behavior exposed [S.M.M.] to [Appellant's] abuse of drugs or alcohol.

[Appellant] showed [S.M.M.] at least one explicit sexual movie, and/or gave [S.M.M.] graphic instructions about how she might perform a variety of sex acts at an entirely too early age. [Appellant] has denied this, but the evidence is clear that this occurred.

[Appellant] hasn't worked to regularly pay child support, when capable of doing so.

When [Appellant's] economic situation was desperate, she relied upon the generosity of others, including Father, to pay her utilities, child support, etc.

B. Father has disregarded court orders on multiple occasions concerning [Appellant's] rights with [S.M.M.] despite warnings by the Court about the consequences.

Father was and is controlling toward [Appellant]. If she didn't arrive for parenting time precisely on time, he

would leave taking [S.M.M.] with him. If she didn't call [S.M.M.] at the ordered times, he typically would not permit [Appellant] to speak with [S.M.M.].

* * * * *

6. When [S.G.] was 16, she shoplifted candy, gum, etc. and did so with [Appellant's] knowledge and tacit consent and amusement. [S.G.] showed [S.M.M.] how to shoplift. It wasn't until [Adoptive Mother] caught [S.M.M.] in the act that this came to light and was dealt with properly.

7. [Appellant's] home life was and is difficult. She lives in a home in a "loud" neighborhood with [S.G.] and [T.]. She pays rent of $200 per month. She may or may not have her boyfriend / fiancée [sic] living with them as well. Earlier it was [M.V.]. More recently it has been [M.T.]. [Appellant] has been earning about $100 per week ($80 babysitting plus $20 cleaning homes), but more recently makes crafts in her home, earning about $120 net per week. She has sought and received help from the Mill Township trustee and Action. She claims she has been looking online for other employment, but there is no other evidence to support this. [Appellant] is frequently without money for utilities and prevails upon the fathers of her three children to give her money. Father gave [Appellant] a $545 check on November 15, 2011, for "child support payment" and a $513 check on June 5, 2012, to "pay her child support". Apparently this was to help get [Appellant] out of trouble with the IV-D Office for not paying her $11 per week child support obligation for [S.M.M.]. [Appellant] accepted this money rather than enforcing her parenting time rights with [S.M.M.].

8. Father has been married to [Adoptive Mother] since 1998. [Adoptive Mother] has been [S.M.M.'s] mother figure most of the time since her birth in November 2003. [Adoptive Mother]

has a full time job. She is genuinely concerned about [S.M.M.'s] well being, but studiously stays out of the toxic conflict between [Appellant] and Father.

* * * * *

11. From March 11, 2013, through March 11, 2014, [Appellant] paid only the following child support:

    A. $50 on April 5, 2013; and

    B. $100 on July 22, 2013.

During that time her obligation was to pay $11 weekly ($572 annually). Her next support payment was not made until June 28, 2014, when she paid $954. Her next payment was received on February 9, 2015, for $429. [Appellant] has never regularly paid her very nominal child support obligation, despite being physically and mentally able to work and satisfy this obligation on a regular basis.

12. [Appellant] is unfit to be a parent to [S.M.M.] She hasn't taken her financial obligation seriously. She set a terrible example for [S.M.M.]. She exercised poor judgment in regard to the sex video and the shoplifting incidents. She has had little stability. [Appellant] put her own interests ahead of the needs of her daughter, [S.M.M.], which resulted in behavioral issues, anxiety, etc. [Appellant] did make an effort to visit with [S.M.M.] in a supervised setting between June 11, 2013, to August 11, 2014, but it was too little and too late. More importantly, the visits were not beneficial to [S.M.M.].

13. [S.M.M.'s] best interests will be served by severing the legal tie between [Appellant] and [S.M.M.]. It is the only way

[S.M.M.] can finally get on with her life without the turmoil associated with forcing [S.M.M.] to have contact with [Appellant], which contact would likely be subverted by Father.

14. The Court is including this paragraph as an observation. It isn't being relied upon to reach the judgment. [Appellant] has given up her token efforts to communicate with [S.M.M.] and has abandoned her. [Appellant] hasn't seen nor communicated with [S.M.M.] since August 11, 2014. Perhaps [Appellant] realizes that trying to re-enter [S.M.M.'s] life was harmful to [S.M.M.], rather than helpful. Maybe [Appellant] is now putting [S.M.M.'s] interests first by stepping out of the way. If this were being considered, it would satisfy I.C. § 31-19-9-8(b).[1]

Appellant's Appendix Vol. 2 at 49-50, 52. The court ordered that Appellant's consent was not required for the adoption to proceed pursuant to Ind. Code § 31-19-9-8(a)(2), -8(a)(11). On January 28, 2016, the Decree of Adoption was subsequently filed.

## Discussion

[15] The issue is whether the court erred in granting Adoptive Mother's petition for adoption over the objection of Appellant. When reviewing the trial court's ruling in an adoption proceeding, we will not disturb that ruling unless the evidence leads to but one conclusion and the trial judge reached an opposite conclusion. *In re Adoption of T.L.*, 4 N.E.3d 658, 662 (Ind. 2014). We presume

---

[1] Ind. Code § 31-19-9-8(b) provides that "If a parent has made only token efforts to support or to communicate with the child the court may declare the child abandoned by the parent."

the trial court's decision is correct, and we consider the evidence in the light most favorable to the decision. *Id.*

[16] When the trial court has made findings of fact and conclusions of law, we apply a two-tiered standard of review: we must first determine whether the evidence supports the findings and second, whether the findings support the judgment. *Id.*; *see* Ind. Trial Rule 52(A) (providing that where the trial court has made findings of fact and conclusions of law, "the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses"). Factual findings are clearly erroneous if the record lacks any evidence or reasonable inferences to support them and a judgment is clearly erroneous when it is unsupported by the findings of fact and the conclusions relying on those findings. *In re Adoption of T.L.*, 4 N.E.3d at 662.

[17] Ind. Code § 31-19-9-1(a) provides in part that, "[e]xcept as otherwise provided in this chapter, a petition to adopt . . . may be granted only if written consent to adoption has been executed" by "(2) The mother of a child born out of wedlock and the father of a child whose paternity has been established by . . . (B) a paternity affidavit executed under IC 16-7-2-2.1 . . . ." However, Ind. Code § 31-19-9-8 provides that:

> (a) Consent to adoption, which may be required under section 1 of this chapter, is not required from any of the following:

* * * * *

> (2) A parent of a child in the custody of another person if for a period of at least one (1) year the parent:
>
>> (A) fails without justifiable cause to communicate significantly with the child when able to do so; or
>>
>> (B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.
>
> * * * * *
>
> (11) A parent if:
>
>> (A) a petitioner for adoption proves by clear and convincing evidence that the parent is unfit to be a parent; and
>>
>> (B) the best interests of the child sought to be adopted would be served if the court dispensed with the parent's consent.

[18]  Here, the trial court found that all of the foregoing statutory provisions applied to Appellant, and she challenges the court's findings with respect to each provision. "However, the statute is written in the disjunctive such that the existence of any one of the circumstances provides sufficient ground to dispense with consent." *In re Adoption of E.A.*, 43 N.E.3d 592, 597 (Ind. Ct. App. 2015) (quoting *In re Adoption of O.R.*, 16 N.E.3d 965, 973 (Ind. 2014)), *trans. denied*. Because we conclude the trial court properly relied on at least one statutory provision—namely, that Adoptive Mother proved by clear and convincing

evidence that Appellant is unfit to be a parent and that the best interests of S.M.M. would be served if the court dispensed with Appellant's consent, *see* Ind. Code § 31-19-9-8(a)(11)—we do not address other provisions on which the trial court may also have relied.

[19] The term "unfit" is not defined in the statute. This court has previously defined "unfit" as "[u]nsuitable; not adopted or qualified for a particular use or service" or "[m]orally unqualified; incompetent." *In re Adoption of M.L.*, 973 N.E.2d 1216, 1223 (Ind. Ct. App. 2012) (quoting BLACK'S LAW DICTIONARY 1564 (8th ed. 2004)). We have also looked to cases concerning the termination of parental rights for guidance in determining what makes a parent "unfit," as the termination and adoption statutes "strike a similar balance between the parent's rights and the child's best interests." *Id.* Termination cases look to factors such as a parent's substance abuse, mental health, willingness to follow treatment recommendations, lack of insight, and instability in housing and employment. *Id.* Also, this court has consistently held in the termination context that it need not wait until children are irreversibly harmed such that their physical, mental, and social development are permanently impaired before terminating the parent-child relationship. *See, e.g.*, *In re A.P.*, 981 N.E.2d 75, 83 (Ind. Ct. App. 2012).

[20] Appellant argues regarding her fitness that she has followed the court's recommendations "and taken every action available to her." Appellant's Brief at 15. She asserts that the notes from Cornerstone and Keystone, which were submitted into evidence, demonstrate that she followed recommendations and

that no issues were present during the visits, that she has had adequate housing for the last twelve years, and, now that T. is in school, intends to gain employment. She maintains that the lack of progress since the February 2013 order "has only been hindered by Father's refusal to allow parenting time," Father and Adoptive Mother's refusal to help facilitate a relationship between Appellant and S.M.M., and Father's refusal to allow Appellant to participate in S.M.M.'s therapy. *Id.* at 16. She argues that because Adoptive Mother cannot prove that Appellant is unfit, "the issue of whether or not the adoption is in the best interest of S.M.M.[] is moot and need not be addressed." *Id.*

[21] Adoptive Mother argues that Appellant missed approximately twenty-six percent of the supervised visits following the February 2013 order and, to the extent Appellant suggests Adoptive Mother and Father failed to facilitate a relationship between her and S.M.M., their relationship is filled "with incident after incident of behaviors and lifestyle choices by [Appellant] that put the health, safety and emotional well-being of S.M.M. at risk enough to warrant supervised parenting time." Appellee's Brief at 13. Adoptive Mother maintains that each time Appellant was given an opportunity to have unsupervised parenting time with S.M.M., such parenting time was restricted due to new findings that she was damaging S.M.M. She asserts that her relationship with S.M.M. is healthy, stable, and positive.

[22] The court found Appellant to be unfit primarily because she exercised poor parental judgment, did not take her financial obligations seriously, and caused S.M.M. to exhibit behavioral issues. The evidence supporting these findings

includes the GAL Report, which stated that S.M.M. appeared to behave differently at Appellant's home in that she was not obedient and was disruptive. The GAL recounted an incident she observed in which S.M.M. crawled on top of the sink in the bathroom and "positioned herself into 'doggie style' and proceed[] to simulate a sex act," and that "[i]t was very clear that she was simulating something she had seen, whether on TV or in person, and she laughed a bit mischievously . . . ." Appellant's Appendix Vol. 2 at 194-195. Also during the visit, S.M.M. attempted to open mouth kiss her sister and lift the GAL's shirt. The GAL observed that the home was not structured and that Appellant's supervision was inadequate. The GAL Report stated that the GAL obtained access to video recordings depicting many people at Appellant's home at night, constant cussing and discussions of heavy drinking, and S.M.M. crying for nearly twenty-five minutes. Another video depicted suspicious activity at Appellant's home involving three young males arriving in the night and staying for approximately twenty minutes. The report discussed Appellant's financial situation, including that she had an issue paying her gas bill.

[23] The GAL recommended that Appellant not have overnight visitation privileges, and the court entered a ruling following her recommendation. In May 2010, Appellant was again awarded overnight parenting time, but she again lost these privileges in February 2013 following a hearing at which Dr. Martin testified that S.M.M.'s visitations with Appellant were causing "anxiety type symptoms . . . ." Transcript at 331. Specifically, Dr. Martin testified that Appellant's home was very noisy at night and that there was smoking in the home. He also

testified that Appellant would leave S.M.M., who at the time was seven years old, home at night with T., who was one or two years old, and that S.M.M. would wake up to feed T. a bottle and discover that Appellant was not home. Dr. Martin also testified that S.M.M. learned shoplifting from her half-sister S.G. and that such behavior was known to Appellant and was not corrected until Adoptive Mother learned about it. He noted that Appellant encouraged S.M.M. to pack her bags and leave with her despite the fact that S.M.M. did not want to leave with Appellant. He further testified that S.M.M. viewed pornography at Appellant's residence and subsequently discussed sexually explicit subjects with her friend E.B. based on what S.M.M. had viewed. This caused E.B.'s parents to end her interactions with S.M.M., which had been a positive and important social interaction for S.M.M. Also, once S.M.M. stopped going to Appellant's residence, her anxiety decreased and she did not act out as much.

[24] The court also pointed to ample evidence that Appellant's relationship with S.M.M. has exposed S.M.M. to Appellant's abuse of drugs and alcohol. It observed that Appellant has not been consistent paying her modest child support obligation of eleven dollars per week. It observed that Appellant has not maintained steady employment and nets about $120 per week making crafts. It further observed that Appellant made some effort between June 2013 and August 2014 at supervised parenting but that such interactions had not progressed, were too little too late, and were not beneficial to S.M.M.

Based upon the record before us, we cannot say that the court's conclusion that Appellant is unfit is clearly erroneous. *See In re Adoption of M.L.*, 973 N.E.2d at 1224 (holding that sufficient evidence supported the trial court's conclusion that the father is not a fit parent, including the father's history of self-medicating with drugs and alcohol, his inability to maintain steady employment, and the fact that Father contributed little to the child's support due to financial struggles).

Regarding S.M.M.'s best interests, Appellant does not challenge the court's findings and conclusions related and has implicitly conceded the sufficiency of Ind. Code § 31-19-9-8(a)(11)(B), thereby waiving review of the court's determination under that section.

Waiver notwithstanding, the primary concern in every adoption proceeding is the best interests of the child. *Id.* (citing *In re Adoption of J.B.S.*, 843 N.E.2d 975, 977 (Ind. Ct. App. 2006)).

> The State has a strong interest in providing stable homes for children. To this end, early, permanent placement of children with adoptive families furthers the interests of both the child and the State. An adoption enables a child to be raised in a stable, supportive, and nurturing environment and precludes the possibility of state wardship.

*Id.* (quoting *In re Adoption of J.B.S.*, 843 N.E.2d at 977). It is undisputed that Adoptive Mother, in conjunction with Father, have provided S.M.M. with a stable, nurturing environment. It is also undisputed that S.M.M. has a strong bond with Adoptive Mother, views her as her parent and calls her mom, and

sees Adoptive Mother's home as her home. S.M.M. is not bonded with Appellant on that level. Adoptive Mother is able to provide for all S.M.M.'s needs. This evidence supports the trial court's conclusion that adoption is in S.M.M.'s best interests.

## Conclusion

[28] For the foregoing reasons, we conclude that Appellant's consent to the adoption of S.M.M. by Adoptive Mother was not required pursuant to Ind. Code § 31-19-9-8. We affirm the decree of adoption entered by the trial court.

[29] Affirmed.

Robb, J., and Mathias, J., concur.