# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 23 2020, 7:40 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

William A. Goebel
Goebel Law Office
Crawfordsville, Indiana

ATTORNEY FOR APPELLEE

Mark Small
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In Re the Adoption of T.G.,
Eric Kelly,
*Appellant*,

v.

Jesse Glover,
*Appellee*.

June 23, 2020

Court of Appeals Case No.
19A-AD-2839

Appeal from the Clinton Superior Court

The Honorable Donald E. Currie, Judge Pro Tempore

Trial Court Cause No.
12D01-1904-AD-6

**Brown, Judge.**

[1] Eric Kelly ("Stepfather") appeals the denial of his petition for adoption. We affirm.

### Facts and Procedural History

[2] T.G. was born on October 27, 2010, to Melissa Kelly ("Mother"). Jesse Glover ("Father") established paternity in 2017. Mother and Stepfather moved in together in 2017 and were married in 2018. According to the trial court, Father was incarcerated in March 2018 and has an early release date of July 25, 2021.

[3] On April 15, 2019, Stepfather filed a petition for adoption.[1] According to the chronological case summary, the court issued an order on May 14, 2019, stating that Father may appear by phone if contact information was provided, Father filed a motion to appear in person or by phone on May 15, 2019, and the court granted his motion on May 20, 2019, to appear by phone.

[4] On August 26, 2019, the court held a hearing at which Stepfather appeared in person and by counsel and Father appeared by phone from the Edinburgh Correctional Facility. Stepfather testified that he and Mother had been together for about three years and living together for almost two years and that they have a one-month-old child together. He indicated Father established paternity in 2017, was given a graduated visitation schedule, and eventually had visitation every other weekend.[2] He indicated Father's last visitation was March 2, 2018.

---

[1] The petition for adoption is not included in the appellant's appendix.

[2] An order dated May 12, 2017, in the paternity cause stated that Father signed a paternity affidavit and is T.G.'s biological father and set forth a schedule phasing in Father's parenting time, beginning with four hours

He indicated Father was aware of where T.G. lived and had not made any attempts to contact T.G. while he was incarcerated. Stepfather further testified Father had not voluntarily paid any child support since April 23, 2018. He indicated that, according to the support docket, a tax check of $382 was held on May 19, 2018, and there were no support payments since that date.[3] Stepfather testified that he was employed, had been supporting T.G. since he moved in with Mother in 2017, and had not been convicted of any crime.

[5] Mother testified that Father did not take any action to see T.G. until 2017. She testified that Father eventually had parenting time every other weekend and that he was in T.G.'s life for ten months between May 2017 and March 2018. She indicated he had not seen T.G. since March 2, 2018, she lived at the same address since that time, she has had the same phone number since the paternity action began, Father picked up T.G. from her mother's house, her mother still lived at the same address, neither she nor T.G. had received any communication from Father since March 2, 2018, and she had not stopped any attempted communication between T.G. and Father since that date. She stated

---

every other week, increasing parenting time every three or four weeks, and ending with Father having parenting time under the Parenting Time Guidelines. The order also required that Father pay child support of $85 per week by wage withholding order, found his support obligation was retroactive to the date of filing and his arrearage was $850, and ordered him to pay $10 per week toward the arrearage in addition to his weekly child support obligation. The attached child support obligation worksheet indicated Father's weekly gross income was $360.

[3] Petitioner's Exhibit 1 contains a one-page payment history reflecting amounts paid in reverse chronological order. The document listing a payment of $382 by check on May 19, 2018, reflects seven other payments ranging from $20 to $170 from February 15, 2018, through April 23, 2018, and does not contain pages of any payment history prior to February 15, 2018.

she had not received any support from Father since May 2019. She indicated Father had other children, she was in contact with the mother of one of his other children, and to her knowledge Father had made contact with his son E.G. while incarcerated. She indicated she believed Father's criminal record rendered him unfit to continue as a parent of T.G., and when asked why she believed that, she answered "he does not have a license. He does he cannot [sic] hold down a job. So supporting T.G. is a rough thing for him I suppose." *Id*. at 19.

[6] On cross-examination, Father asked "previously before [he requested visitation] what was the arrangements that we [] made when we separated," Mother replied "[w]e didn't have an arrangement," he asked "so before our separation how long was I in T.G.'s life," and she answered "[y]ou weren't cause you were in jail." *Id*. at 20-21. Father asked which address he used when he filed for visitation, she answered "Meadow Lane" because that was her mother's old address. *Id*. at 21. She indicated she lived on Green Street at the time. Father asked "but you just testified that you've been living at the same address with" Stepfather, and she replied "I forgot about that address." *Id*. at 22. She testified "you were updated when I had moved to Three Fifty Nine from Green Street" and "I don't believe I had to inform you of my mother's because that's where you presided [sic] to pick up T.G. after school." *Id*. Father asked "wasn't I the one that was paying for everything when we stayed in Lafayette and moved to Frankfort," and she answered "[n]o." *Id*. at 23.

[7]     The court asked Mother if she was living with Father when T.G. was born, she answered "[n]o," the court asked "[s]o you've never lived with him," she replied "[w]e didn't live together," it asked "[w]hen you talk about separation you guys were never physically living together," she said "[n]o," the court asked "[y]ou've never lived with him," and she replied "[j]ust before she was born." *Id.* at 23-24. Mother then stated "[b]ut when she was born he was incarcerated." *Id.* at 24. The court asked if Father's name was on the birth certificate, she answered affirmatively, the court asked when Father saw T.G. for the first time, and Mother answered "when she was born." *Id.* The court asked "[s]o he was not incarcerated when she was born," and she replied "[a]fter she was born. I'm sorry." *Id.* at 24-25. She indicated Father did not see T.G. on a regular basis after she was born. On redirect examination, she indicated Father saw T.G. a couple of times at the hospital when she was born and did not see her again until 2017.

[8]     Upon questioning by Stepfather's counsel, Father indicated he was in the Edinburgh Correctional Facility and was there for "an HTV violation as a Level Five felony." *Id.* at 29. When asked if "[i]t was a repeat HTV violation" and "[y]ou got sentenced in fact on the HT first HTV in March" 2018 and "then you violated by driving two weeks after that," he answered affirmatively. *Id.* He testified he did not have a phone number for T.G., he "tried for a number yes and was not successful," Mother's phone number was in his cell phone which was in police custody, and "the person I tried to get the number from I was not they weren't able to get a number for me." *Id.* at 30. He indicated

there was a child support order and he was delinquent before he was incarcerated. When asked if he had not made a payment since April 23, 2018, he answered "I had just got locked up in March so April's was the last payment that apparently was received yes." *Id*. at 31. He indicated he was not aware of the May 2018 payment. He indicated this was the first time he was incarcerated in the Department of Correction (the "DOC"), he had been incarcerated in county jails about three times since he moved to Indiana in 2008, he did not have a record in Illinois, he had a conviction for driving while suspended, and he "had one OWI" and "that was four months in Clinton County." *Id*. at 32. He indicated he had been in contact with his son E.G. several times while incarcerated, E.G's mother filed some paperwork and he obtained her number and address through the paperwork, and "[u]nlike T.G. I haven't got any address or numbers or anything. I only have your address and the Courthouse." *Id.* at 33. Stepfather's counsel asked "[h]ave you written me to see T.G.," Father replied that he had not, Stepfather's counsel asked "whose fault is it that you don't have addresses? Is it [Mother's] or your own," and Father replied "I think the responsibility it is my fault that I do not have her address." *Id*.

[9] The court asked if Father had anything else for the court to consider. Father testified that Mother's statements were false, he and Mother lived together in three different apartments, two in Lafayette and one in Frankfort, they paid rent to her mother and her stepfather for an apartment they owned above a sports bar in Frankfort, he was working at US Cold Storage when T.G. was born, he

was fired because he took an extended stay to be with Mother in the hospital, and "also we lived together after that continuously for after that cause I got my lock up was in . . . July of Two Thousand Eleven." *Id.* at 34. He further testified:

> And once I got out I had another job at Wal-Mart that [Mother] was still living together until she moved out one day while I was at work. Um and the other thing is we did have an arrangement that we was couldn't be we had alot of arguments. So that the arrangement was that [Mother] would never see was in town because she was staying at her mother's. Whenever she was in town that I would see T.G. After that I moved out of Clinton County and back to Lafayette. And that arrangement was still standing. Because I would take gifts out to T.G.'s grandmother and leave it at her house. Gifts, cards, birthday, every holiday. Uh I found out through previously at that time through friends that [Mother] was taking the stuff back and getting the money for it. . . . I know I did my part. And until recently like Two Thousand Seventeen I got fed up with the well I'll bring her whenever I have time or whenever she makes time for me. So I filed for the visitation. And even still then after that [Mother] did not apply to bringing T.G. when she was suppose to. Even her lawyer we sat down one day after Court and established that she was suppose to bring her for Christmas. That never happened. And I tried to contact her lawyer at that time and didn't get a response. So yes and not contacting her lawyer I failed (inaudible) this. So no I did not contact him trying to get any information about T.G. Because that time being he didn't give me a response back. So no I did not try to contact him again.

*Id.* at 34-35. He indicated that his release date was in June of 2021. Father also testified "as far as the child support . . . money does not matter because I keep jobs in plenty of times when we first started I was working two jobs . . . to be able to try to pay for to catch up on my other child support," "I had caught up

except for like a Hundred and some dollars," "that was pretty much kind of the reason part of the reason for me filing the child support because I don't care about the money," and "I need to be able to see my daughter on a regular see my kids on a regular." *Id*. at 35-36. The court took the matter under advisement.

[10] On October 1, 2019, the trial court issued an order denying Stepfather's petition for adoption. The court found Father had been incarcerated since March 2018, was in the DOC, had an early release date of July 25, 2021, and does not consent to the adoption petition. It further found:

> 3. The Father was present in the child's [] early life as biological Mother and Father lived together on and off and the parties both significantly contributed to the child's support (physical, emotional, and financial). Father was present at the child's birth and voluntarily signed the birth certificate of the child.
>
> 4. The Father paid support for the child prior to his incarceration. Some tax intercept support has also been paid on behalf of the child since his period of incarceration.
>
> 5. The Father has not had the ability to have contact with the child since his incarceration, however he indicated a strong desire to do so and remain actively engaged in his child's wellbeing.
>
> 6. The mother has not been accommodating or welcoming of contact between the father and minor child since March 2, 2018.

Appellant's Appendix Volume II at 8-9. The court concluded that Stepfather "has failed to prove that the objecting biological Father's consent is not necessary to approve the Petition for Adoption" and that "Father has not

abandoned, nor is he unfit, nor has his lack of communication or contact been voluntary but only because he is an inmate in the Indiana Department of Correction."[4]  *Id*. at 9.  Stepfather filed a motion to correct error, which the court denied.

## *Discussion*

[11]   In family law matters, we generally give considerable deference to the trial court's decision because we recognize that the trial judge is in the best position to judge the facts, determine witness credibility, and obtain a feel for the family dynamics and a sense of the parents and their relationship with their children. *E.B.F. v. D.F.*, 93 N.E.3d 759, 762 (Ind. 2018).  Accordingly, when reviewing an adoption case, we presume that the trial court's decision is correct, and the appellant bears the burden of rebutting this presumption.  *Id*.  When reviewing the trial court's ruling in an adoption proceeding, we will not disturb that ruling unless the evidence leads to but one conclusion and the trial judge reached an opposite conclusion.  *In re Adoption of T.L.*, 4 N.E.3d 658, 662 (Ind. 2014).  The trial court's findings and judgment will be set aside only if they are clearly erroneous.  *E.B.F.*, 93 N.E.3d at 762.  A judgment is clearly erroneous when there is no evidence supporting the findings or the findings fail to support the judgment.  *Id*.  We will not reweigh evidence or assess the credibility of

---

[4] After the court issued the order, Father filed a letter with the trial court requesting an address and phone number for Mother so that he is able to contact T.G. "since threw [sic] all this I have not been given the exact info to be able to contact her."  Appellee's Appendix Volume II at 11.

witnesses. *Id.* Rather, we examine the evidence in the light most favorable to the trial court's decision. *Id.* We generally review rulings on motions to correct error for an abuse of discretion. *Miller v. Rosehill Hotels, LLC*, 45 N.E.3d 15, 18 (Ind. Ct. App. 2015).

[12] Stepfather asserts the trial court erred in finding that he failed to prove that Father's consent was not necessary and cites Ind. Code § 31-19-9-8(a)(1), (2), and (11). He argues that Father abandoned T.G., had contact while incarcerated with his son E.G. but not with T.G., and admitted it was his fault that he did not have contact information available to him. He argues Father failed to communicate with or support T.G., had no contact with her since March 2, 2018, and made no child support payments since the middle of May 2018. He also states that he "believes that in the context of [Father's] limited exercise of his parental rights and obligations (a 10-month period after the child was 6 years of age), coupled with the fact that through his own fault he has placed himself in prison until at least July 25, 2021, shows that he is unfit to be a parent." Appellant's Brief at 11.

[13] Father maintains the evidence is sufficient to support the court's findings and to show Stepfather failed to meet his burden of proof. He argues the evidence supports the finding that he did not have a phone number for Mother and the court found he paid child support prior to his incarceration. He argues Stepfather simply asks this Court to disregard the standard of review and reweigh the evidence. He also argues that, while Mother indicated a belief that

he was an unfit parent due to his criminal record and lack of a license, the trial court noted his involvement and desire to be involved in T.G.'s life.

[14] Ind. Code § 31-19-11-1 provides in part that the trial court shall grant a petition for adoption if it hears evidence and finds in part that the adoption requested is in the best interest of the child and "proper consent, if consent is necessary, to the adoption has been given." A petition to adopt a child may be granted only if written consent to adoption has been executed by the father of a child whose paternity has been established. *See* Ind. Code § 31-19-9-1. However, Ind. Code § 31-19-9-8(a) provides that consent to adoption "is not required from any of the following":

> (1) A parent or parents if the child is adjudged to have been abandoned or deserted for at least six (6) months immediately preceding the date of the filing of the petition for adoption.
>
> (2) A parent of a child in the custody of another person if for a period of at least one (1) year the parent:
>
>> (A) fails without justifiable cause to communicate significantly with the child when able to do so; or
>>
>> (B) knowingly fails to provide for the care and support of the child when able to do so as required by law or judicial decree.
>
> * * * * *
>
> (11) A parent if:
>
>> (A) a petitioner for adoption proves by clear and convincing evidence that the parent is unfit to be a parent; and
>>
>> (B) the best interests of the child sought to be adopted would be served if the court dispensed with the parent's consent. . . .

If a petition for adoption alleges that a parent's consent to adoption is unnecessary under Ind. Code § 31-19-9-8(a)(1) or (2) and the parent files a motion to contest the adoption, the "petitioner for adoption has the burden of proving that the parent's consent to the adoption is unnecessary under IC 31-19-9-8." Ind. Code § 31-19-10-1.2(a). If a petition for adoption alleges that a parent's consent to adoption is unnecessary under Ind. Code § 31-19-9-8(a)(11) and the parent files a motion to contest the adoption, the "petitioner for adoption has the burden of proving that the requirements of IC 31-19-9-8(a)(11) are satisfied and that the best interests of the child are served if the court dispenses with the parent's consent to adoption." Ind. Code § 31-19-10-1.2(e). Ind. Code § 31-19-10-0.5 provides: "The party bearing the burden of proof in a proceeding under this chapter must prove the party's case by clear and convincing evidence."

[15] The clear and convincing evidence standard is an intermediate standard of proof greater than a preponderance of the evidence and less than proof beyond a reasonable doubt. *See T.D. v. Eskenazi Health Midtown Cmty. Mental Health Ctr.*, 40 N.E.3d 507, 510 (Ind. Ct. App. 2015). In order to be clear and convincing, the existence of a fact must be highly probable. *Id*. "The clear and convincing standard is employed in cases where the wisdom of experience has demonstrated the need for greater certainty, and where this high standard is required to sustain claims which have serious social consequences or harsh or far reaching effects on individuals." *Civil Commitment of T.K. v. Dep't of Veterans*

*Affairs*, 27 N.E.3d 271, 276 (Ind. 2015) (citation and internal quotation marks omitted).

[16] This Court has observed that imprisonment standing alone does not establish statutory abandonment. *Lewis v. Roberts*, 495 N.E.2d 810, 813 (Ind. Ct. App. 1986) (citation omitted) (cited with approval by *In re Adoption of E.A.*, 43 N.E.3d 592 (Ind. Ct. App. 2015), *trans. denied*). Neither should confinement alone constitute justifiable reason for failing to maintain significant communication with one's child. *Id.* Incarceration, however, unquestionably alters the means for significant communication. *Id.* What constitutes insignificant communication with a free parent may be significant in relation to an incarcerated parent with limited access to his child. *Id.* We are also mindful that in general an incarcerated parent's child support obligation should reflect the parent's real financial capacity. *See In re Adoption of T.L.*, 4 N.E.3d 658, 663 (Ind. 2014).

[17] The burden was on Stepfather, as the petitioner for adoption, to prove that the requirements of Ind. Code § 31-19-9-8(a)(1), (2), or (11) were satisfied by clear and convincing evidence. *See* Ind. Code §§ 31-19-10-0.5 and -1.2. The evidence most favorable to the trial court's decision reveals that Father was present at the hospital when T.G. was born and signed her birth certificate and that, in 2017, he filed a petition to establish paternity. Father testified that he took gifts and cards to the house of T.G.'s grandmother and that he discovered Mother was returning the gifts for money. Father obtained a court order requiring him to pay child support based on his weekly gross income of $360 and phasing in

parenting time until he was exercising parenting time pursuant to the Parenting Time Guidelines. The parties agree that Father stopped his visitation with T.G. due to his incarceration. The record reveals Father was employed prior to his incarceration and had made child support and arrearage payments, and Stepfather did not demonstrate that Father was able to continue making support payments while incarcerated. The trial court heard and was able to consider the testimony of Stepfather, Mother, and Father regarding Father's incarceration and his relative efforts to communicate with and provide care and support for T.G. prior to and following his incarceration. The court specifically found that Father was present in T.G.'s early life as he and Mother lived together on and off and significantly contributed to the child's support, Father paid support for T.G. prior to his incarceration, Father has not had the ability to have contact with T.G. since his incarceration but indicated a strong desire to do so and to remain actively engaged in T.G.'s wellbeing, and Mother has not been accommodating or welcoming of contact between Father and T.G. The trial court was in the best position to judge the facts, and we will not reweigh evidence or assess the credibility of the witnesses. We cannot say under these circumstances that Stepfather has met his burden to overcome the presumption the trial court's decision is correct or that the evidence leads to but one conclusion and the trial court reached the opposite conclusion.

[18] For the foregoing reasons, we affirm the judgment of the trial court.

[19] Affirmed.

Najam, J., and Kirsch, J., concur.